UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

MICHAEL H. SIMONSON,

    Defendant.

NO.  CR-05-144-RHW

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS,** *INTER ALIA*

    Before the Court are the Government's Motion for Discovery (Ct. Rec. 24), Defendant's Motion for Extension of Time to File (Ct. Rec. 31), Defendant's Motion to Dismiss Count One of the Indictment (Ct. Rec. 33), Defendant's Motion to Suppress Statements and Evidence Obtained as a Result of Statements (Ct. Rec. 36), Defendant's Motion to Dismiss Indictment (Ct. Rec. 38), and Defendant's Motion to Suppress Evidence Obtained from Warrants (Ct. Rec. 40).  A hearing was held on these matters on December 19, 2005.  Defendant was present and represented by Kimberly Deater.  Assistant United States Attorney Jared Kimball appeared on behalf of the Government.

    The Indictment (Ct. Rec. 1), filed on August 9, 2005, charges Defendant with the following four counts: (1) Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. §§ 2423(b), (e), & (f), 2246(2), and 2243(a); (2) Attempted Enticement, in violation of 18 U.S.C. §§ 2422(b), 2243(a); (3) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (4) Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2)(A). ///

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 1

### BACKGROUND

The following background is based upon discovery provided by the Government. Defendant supplied this information in his memorandum, but he asserted that he does not stipulate to it.

On April 15, 2005, Defendant attempted to enter Canada by Greyhound bus at the Blaine Port of Entry. Defendant was stopped and questioned by Canadian border officials at about 3:45 p.m. Defendant reported he was going to Whistler and Squamish for vacation, but he could not provide the location where he was staying when questioned further. Canadian officials reported he appeared nervous, evasive, and unclear of his intended purpose of visit. At this point, Canadian officials took Defendant aside and began questioning him about the purpose of his visit.

Ultimately, Defendant told Canadian officials that he was entering Canada to meet S.C., a Canadian girl aged 15 whom he had met on the internet in September 2004. Canadian officials detained Defendant from about 3:45 to 4:45 p.m., questioning him about his relationship with S.C. Defendant told Canadian officers he was intending to meet S.C. at the Vancouver, British Columbia, bus depot. He gave them her cell phone number and told them it was to be their first in-person meeting. He also gave officers a physical description of S.C. He was never informed of the right to remain silent.

A secondary search of Defendant's person and baggage did not reveal any contraband, but officers did find currency, a computer printout of directions to S.C.'s place of employment, a book titled "Sex and the Perfect Lover," a Victoria's Secret magazine with S.C.'s phone number on it, letters from S.C., a digital camera and memory cards, Viagra, condoms, massage oil, and pictures of Defendant with his two children. The information elicited in this interview was relayed to Canadian Customs Regional Intelligence Officer Stacey Bruce who then relayed the information to other law enforcement officers, including U.S. Immigration and

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 2

Customs Enforcement ("ICE") Special Agent William Darrah.

Based on his candid statements about his intentions, Defendant was denied entry into Canada.  At about 4:45 p.m., Defendant was escorted to the United States Port of Entry in Blaine, Washington.  At 5:00 p.m., Canadian officials contacted the Vancouver police department, gave them the description of S.C., and requested that a detective meet her at the bus stop.  At 5:30 p.m., the detective found S.C. at the bus stop and interviewed her at length.

Upon receiving the call from Officer Bruce, ICE Agent Darrah left his office and drove to the Blaine Port of Entry, a distance of about one mile.  Officer Bruce called Agent Darrah because Defendant's name had come up in an investigation in late-March.  Agent Darrah reported during the evidentiary hearing before this Court that he was notified on March 30, 2005, that Defendant had been renting a room on behalf of a 15-year-old Canadian girl with whom the Canadian police had come into contact in the Squamish, B.C., area.  During their March 30, 2005, conversation, Officer Bruce informed Agent Darrah that appearances had led her and other officials to believe there was an inappropriate relationship between Defendant and the girl.

Once Defendant was in the Blaine Port of Entry office, at about 4:45 p.m., he was met by two Customs & Border Patrol Officers ("CBPOs"), Dave Botten and Eric Bikker.  Before questioning Defendant, the CBPOs were told why he was denied entry into Canada.  The officers saw Agent Darrah before initiating their inspection.  Agent Darrah told the officers that he intended to interview Defendant when they were finished with him, and that they should just "do their job" during the inspection.

The officers asked Defendant to fill out a standard Customs Declaration. After Defendant completed the form and without *Mirandizing* Defendant, the officers asked why he had traveled to Canada.  Defendant stated he was going to visit a 15-year-old girl named S.C., whom he had met over the internet.  Defendant

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 3

asked if he was being arrested, at which time the officers told him he was not. Rather, they asserted he was being inspected because he was now trying to re-enter the United States after being denied entry into Canada. The Government reports that the questions and Customs Declaration presented to Defendant were standard procedure for those requesting re-entry after being denied entry into Canada.

The officials also asked Defendant why he had traveled to Canada by bus, and he responded that his relationship with S.C. was secret and the two of them felt it would be best if a Washington-plated vehicle was not parked in front of her apartment. Although Defendant was returned to the Blaine Port of Entry at 4:45 p.m., Officer Bikker's report indicates the actual inspection interview did not begin until about 5:30 p.m.

After Defendant's inspection with the CBPOs, ICE Special Agents Darrah and Andrew Poore began their meeting with Defendant at 5:51 p.m. Their meeting took place in a detention cell that was away from the public area of the Blaine Port of Entry. The Government states that Defendant agreed to the use of a separate room for the interview for privacy based on the nature of his admitted intentions in Canada. The Government also asserts that the door to the room was intentionally left open during the interview, except for brief periods when Defendant requested to use the restroom. Both agents were aware of the information elicited by Canadian authorities and of Defendant's prior payment of hotel accommodations for a young Canadian girl. The agents questioned Defendant and elicited numerous statements of a general nature without mentioning *Miranda*.

The agents initially gathered background information from Defendant (age, address, physical description, work address, employer's name, education, family situation). Defendant reports that he was also asked what he had taken with him, what was in his wallet, his digital camera, etc. Defendant told the agents he had been denied entry into Canada and gave the details of his travel. He then stated the purpose of his visit, *i.e.*, to meet with 15-year-old S.C. After this response, at 6:11

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 4

p.m., the agents stopped asking questions and took a break, leaving Defendant alone in the room.  Upon their return, the agents advised Defendant of his *Miranda* rights.

The agents informed Defendant of his *Miranda* rights from a standard card. Defendant indicated to them that he understood his *Miranda* rights.  However, the agents never asked him if he was willing to waive his rights, nor did they present Defendant with a written waiver.

At this point, Defendant began to talk more freely about his intended travel to Canada.  He again gave a physical description of S.C., her age, cell phone number, and told the agents that he was supposed to meet her at the bus station.  At this point, at about 6:16 p.m., the agents again left the room so that Agent Darrah could place a call to check on S.C.'s safety.

The agents returned at 6:20 p.m. and resumed questioning.  Defendant then went into further detail about his travel to Canada, his relationship with S.C., the fact that he knew she was only 14 when they began communicating on-line, the letters from S.C. that he had in his possession, and that S.C. had told him (correctly) that the age of consent in Canada is 14.  Defendant also told the agents that he knew the age of consent in the United States was 16 or 18, that he had paid for S.C. to stay in a hotel with his credit card number, and that while he intended to have sex with her during his visit, he did not intend to "force" her.

The agents also asked Defendant about his vehicle, and he reported that his truck was parked at the Bellingham bus depot.  The agents asked for consent to search the vehicle at about 7:19 p.m.  Defendant consented verbally, and a written consent to search form was filled out and signed at 9:40 p.m.  The vehicle search took place the next day.

The Government reports that the interview ceased at 7:22 p.m.  Defendant was "released" to the public area on his own recognizance; however, U.S. officials retained his wallet, identification, car keys, and personal belongings.  At some

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 5

point between the conclusion of the interview and 9:30 p.m., Agent Darrah placed a call to an Assistant United States Attorney from the Western District of Washington.  He was called back and informed that the U.S. Attorney did intend to prosecute Defendant.

At 9:30 p.m., Agent Darrah brought Defendant back to the detention cell. The agent told Defendant that the *Miranda* rights read to him earlier were still in effect and asked Defendant if he still wanted to talk.  Defendant stated he would. On Agent Darrah's request, Defendant filled out the consent to search his vehicle. Defendant was then asked if he would like to prepare a written statement, and he declined.  At 9:44 p.m., Defendant was arrested.

## PROCEDURAL HISTORY

On April 17, 2005, a Criminal Complaint was filed in the Western District of Washington charging Defendant with Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b) and (c).  On April 18, 2005, Defendant made an initial appearance in Seattle on this allegation.  Defendant appeared for a detention hearing on April 21, 2005, and he was released on conditions.

Defendant appeared for a Preliminary Hearing on May 2, 2005, and Magistrate Judge Monica Benton found probable cause.  On May 5, 2005, Defendant moved for dismissal of the Amended Complaint without prejudice, and on May 6, 2005, the United States moved for dismissal pursuant to Rule 48(a). The Motion to Dismiss was granted on May 6, 2005, and the indictment was dismissed without prejudice.

While Defendant's case was moving through the Western District, on April 20, 2005, Magistrate Judge Imbrogno from the Eastern District of Washington approved a search warrant for Defendant's home and computers.  The affidavit of probable cause included Defendant's admission to Canadian officials; his admissions to CBPOs Botten and Bikker; the information received by Agent

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 6

Darrah on March 30, 2005; Defendant's admissions to Agent Darrah; the contents of his baggage; the correspondence Defendant had on his person; S.C.'s confirmation to Canadian police that she was intending to meet Defendant; and the contents and recent activity from Defendant's cell phone on April 15, 2005, including recent calls and text messages. The search revealed more information about Defendant's relationship with S.C., his research on the Criminal Code of Canada and the laws surrounding internet child luring, and sixty-four (64) computer disks.

An agent applied for a second warrant and received it on May 20, 2005, after the initial case had been dismissed. The affidavit submitted contained the same information as the April 20, 2005, affidavit, along with some additional information discovered during the April 20, 2005, search. Defendant reports that the agent pursuing the warrant did not inform Magistrate Judge Imbrogno that the case in the Western District had been dismissed. This warrant broadened the scope of the agents' search. The items recovered in this search and through the broadened scope revealed images of child pornography and extensive chat logs. Defendant reports that this search also included privileged correspondence between him and his attorney from the Western District case.

The current indictment was filed on August 9, 2005, and charges Defendant with four counts: (1) Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. §§ 2423(b), (e), & (f), 2246(2), and 2243(a); (2) Attempted Enticement, in violation of 18 U.S.C. §§ 2422(b) and 2243(a); (3) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (4) Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2)(A).

## DISCUSSION

Before the Court are Defendant's Motion to Suppress Statements and Evidence Obtained as a Result of Statements (Ct. Rec. 36), Motion to Dismiss Count One of the Indictment (Ct. Rec. 33), Motion to Dismiss Indictment (Ct. Rec.

38), and Motion to Suppress Evidence Obtained from Warrants (Ct. Rec. 40).

## I.    Defendant's Motion to Dismiss Count 1

Defendant moves the Court for an order dismissing Count 1 of the indictment, which charges a violation of 18 U.S.C. § 2423(b), (e), and (f), traveling and attempting to travel in foreign commerce for the purpose of engaging in illicit sexual conduct as defined in 18 U.S.C. § 2246(2). Defendant argues the Court does not have jurisdiction and that the prosecution of Count 1 violates the principles of international law. Further, he contends the extrajudicial application of the statute denies due process and is unconstitutional. The Government responds that the crux of Defendant's argument is that the legal age for consensual sex in Canada is 14, so Defendant's planned sexual encounter with S.C. in Canada would not constitute a crime. The Government states this is not "a legally competent argument."[1]

Defendant argues that the actions Defendant is alleged to have taken, *i.e.*, traveling to Canada with the intent to engage in some type of sexual act with a 15-year-old Canadian female, would not have been in violation of Canadian law. Therefore, the Government lacks jurisdiction to prosecute this matter because the United States does not have the authority to force the enactment of its own laws in another sovereign. He states that prosecution in this case is analogous to prosecuting a U.S. citizen for admitting that he intended to smoke marijuana once he arrived in Amsterdam, where such conduct is legal. Alternatively, Defendant submits that the application of this statute in this case is unreasonable and violates due process because Defendant could not have reasonably anticipated that he

---

[1] Neither party addresses the initial issue of whether this law is applied extraterritorially. Section 2423(b) is a crime of intent ("travels . . . for the purpose of engaging in any illicit sexual conduct"), and that intent is formed within the United States. However, the Court will proceed with the analysis of Defendant's arguments.

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 8

would be prosecuted in this country for conducting himself within the confines of Canadian law while in Canada.

Defendant is charged in Count 1 with a violation of 18 U.S.C. § 2423(b), (e), and (f), traveling and attempting to travel in foreign commerce for the purpose of engaging in illicit sexual conduct as defined in 18 U.S.C. § 2246(2).  18 U.S.C. § 2423(b) states in pertinent part: "a United States citizen . . . who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both."  Section 2423(e) permits the prosecution of any person who attempts or conspires to violate § 2423(a), (b), (c), or (d).

18 U.S.C. § 2423(f) defines "illicit sexual conduct" as "a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States[.]" Section 2246 includes various definitions for a "sexual act."  18 U.S.C. § 2246(2).

Chapter 109A governs sexual abuse of a minor, and holds that "[w]hoever, in the special maritime and territorial jurisdiction of the United States . . . knowingly engages in a sexual act with another person who— (1) has attained the age of 12 years but has not attained the age of 16 years; and (2) is at least four years younger than the person so engaging; or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both."  18 U.S.C. § 2243(a).

In *United States v. Clark*, 315 F. Supp. 2d 1127 (W.D. Wash. 2004), Judge Lasnik considered challenges identical to Defendant's in relation to a prosecution under 18 U.S.C. § 2423(c).[2]  Section 2423(c) permits prosecution of U.S. citizens

---

[2]  *United States v. Clark* is currently on appeal to the Ninth Circuit.  *See also* James Asa High, Jr., Note, *The Basis for Jurisdiction over U.S. Sex Tourists: An Examination of the Case Against Michael Lewis Clark*, 11 U.C. Davis J. Int'l L. &

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 9

who travel in foreign commerce and engage in any illicit sexual conduct with another person.  18 U.S.C. § 2423(c).  Section 2423(c) is therefore more broad in application than § 2423(b), for it criminalizes an act committed entirely in another country.  In contrast, § 2423(b) criminalizes *traveling for the purpose* of engaging in illicit sexual conduct.  *See Clark*, 315 F. Supp. 2d at 1130 (comparing § 2423(c) and § 2423(b), and noting that the purpose of § 2423(c)'s passage "was to remove the requirement that the Government prove that the defendant traveled for the purpose of engaging in illegal activity").  Considering § 2423(c)'s more suspect basis in U.S. constitutional and international law, the court's reasoning in *Clark* applies equally, if not more forcefully, to an analysis of § 2423(b)'s constitutionality and propriety under international law.  Therefore, the Court draws much of the reasoning and discussion below from the district court's opinion in *Clark*.

## A.    International Law

Defendant argues that the extraterritorial application of § 2423(b) violates the principles of international law in large part because it conflicts with the law of Canada.  However, "[w]hen 'determining whether a statute applies extraterritorially, [courts] presume that Congress did not intend to violate principles of international law.'" *Clark*, 315 F. Supp. 2d at 1131 (quoting *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963)).  The *Clark* court further noted that

> [i]nternational law recognizes several principles under which the exercise of extraterritorial jurisdiction may be appropriate, including (1) the objective territorial principle, under which jurisdiction is asserted over acts performed outside the United States that produce detrimental effects in the United States; (2) the protective principle, under which jurisdiction is asserted over foreigners for acts committed outside the United States that may impinge on the territorial integrity, security, or political independence of the United States; (3) the nationality principle, under which jurisdiction is based on the nationality or national character of the offender; (4) the universality principle, which provides jurisdiction over extraterritorial acts for crimes so heinous as to be universally

Pol'y 343 (2005).

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 10

condemned; and (5) the passive personality principle, under which jurisdiction is based upon the nationality of the victim.

*Id*. (citing *United States v. Velasquez-Velasco*, 15 F.3d 833, 840 n.5 (9th Cir. 1994), in turn citing *Restatement (Third) of Foreign Relations of Law of the United States* § 402 cmt. a (1987)).

In the case at hand, Defendant used American sources of funding to travel to Canada.  He was an American citizen with residence in the Eastern District of Washington.  "[A]long with the many benefits that American citizenship confers upon those who hold it, come certain obligations of citizenship including the obligation to obey laws that specifically apply to one's conduct."  *Id*. (internal quotations and citations omitted).  Moreover, as the *Clark* court noted, the sexual abuse criminalized by § 2423 is "universally condemned."  *Id*. at 1131, 1131 n.3.

Defendant seeks to distinguish his alleged behavior from that at issue in *Clark*.  The *Clark* defendant was arrested by Cambodian National Police in Phnom Penh for engaging in sexual contact with two Cambodian boys, ages 10 and 13. *Clark*, 315 F. Supp. 2d at 1127, Def.'s Mem. Support.  Defendant asserts that Clark's behavior was not only a violation of U.S. law, but also a violation of Cambodian law.  In the case at hand, Defendant sought to have "consensual" sexual relations with a 15-year-old Canadian girl in Canada, where the age of consent is 14.  Defendant therefore asserts that claiming his conduct is "so heinous as to be universally condemned" would be clearly erroneous.

However, the statute clearly defines "illicit sexual conduct" as conduct that would be in violation of U.S. law if performed in the territorial jurisdiction of the United States.  18 U.S.C. § 2423(f).  Although the details of various ages of consent and laws regarding sexual contact with children may differ between nations, the fact of universal condemnation in general remains true.  Holding Defendant to the standard set by Congress, particularly when he formed his intent to travel and began his travels within the United States, comports with the standards of international law.  Consequently, extraterritorial jurisdiction is

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 11

appropriate here under both the nationality and the universality principles. *See*

*Clark*, 315 F. Supp. 2d at 1131.

## B.    Reasonableness

"Even if principles of international law serve as bases for extraterritorial

application of a law, international law also requires that such application of the law

be reasonable." *Id.* at 1132 (citing *Vasquez-Velasco*, 15 F.3d at 840).  Factors that

may be considered when determining reasonableness include:

> (a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
> (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
> (e) the importance of the regulation to the international political, legal, or economic system;
> (f) the extent to which the regulation is consistent with the traditions of the international system;
> (g) the extent to which another state may have an interest in regulating the activity; and
> (h) the likelihood of conflict with regulations by another state.

*Vasquez-Velasco*, 15 F.3d at 840 n.6 (quoting *Restatement (Third) of Foreign*

*Relations Law of the United States* § 403(2)).

Here, as opposed to *Clark*, the charged activity took place entirely within the

United States.  The other reasonableness factors generally also weigh in favor of a

finding of reasonableness: Defendant, the person responsible for the activity

regulated by § 2423(b), is a citizen and resident of the U.S., and Congress has

made regulation of "sexual tourism" a priority, with other states similarly

regulating it.  This type of regulation is entirely consistent with the traditions of the

international system, as well.  Certainly the regulation of the age of consent in

Canada differs from that in the United States.  However, the evidence in this case,

particularly Defendant's awareness of U.S. and Canadian laws regarding the age of

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 12

consent, supports the conclusion that any expectations Defendant may have had about avoiding prosecution were unjustified.[3]  Therefore, the Court finds the extraterritorial application of § 2423(b) is reasonable under international law. *Accord Clark*, 315 F. Supp. 2d at 1132 (finding § 2423(c) reasonable under international law).

### C.    Due Process

"That the extrajudicial application of a criminal statute comports with international law does not 'conclusively determine whether due process is satisfied.'" *Id.* (quoting *United States v. Davis*, 905 F.2d 245, 249 n.2 (9th Cir. 1990)).  Instead, the Due Process Clause requires that the Government establish a "'sufficient nexus' between the defendant or the conduct condemned and the United States such that the extraterritorial application of the statute would not be arbitrary or fundamentally unfair." *Id.*  The "nexus" requirement ensures that a U.S. court "will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." *Id.* (citing *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998)).  When a crime is committed by an American citizen and resident, a sufficient nexus exists. *Id.* at 1133.

In this case, the planned sexual conduct is not the crime; the travel with intent to engage in that conduct is.  Therefore, whether or not Defendant's actual conduct within Canada would have been legal there, his travel in the United States and across the Canadian border with the intent to engage in conduct that is illicit under American law creates a sufficient nexus so as to satisfy due process.

## II.    Defendant's Motion to Dismiss the Indictment

---

[3]  Indeed, Defendant's alleged planning illustrates that he is exactly this statute's target: one who travels to foreign countries seeking sex with children in order to avoid prosecution.  *Clark*, 315 F. Supp. 2d at 1130 (citing H.R. Rep. No. 107-525, at 3 (2002)).

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 13

1    Defendant moves the Court to dismiss the indictment due to the

2  Government's intrusion into the attorney-client relationship.  Defendant's request

3  is based on the Sixth Amendment and *United States v. Morrison*, 449 U.S. 361

4  (1981).  The Government argues that this case is distinguishable from *Morrison*,

5  and, although certain privileged materials were obtained during the May 20, 2005,

6  search, these materials related to Defendant's previous case, they were obtained in

7  error, and the proper remedy is suppression, not dismissal of the indictment.

8    In *Morrison*, the Supreme Court considered a defendant's motion to dismiss

9  for a violation of her Sixth Amendment rights.  The agents in *Morrison* spoke

10  directly to the defendant, knowing she was represented by counsel on a pending

11  indictment.  *Id.* at 362.  The agents approached the defendant seeking to obtain her

12  cooperation in a related investigation.  *Id.*  In doing so, the agents disparaged the

13  defendant's attorney, tried to convince her she was wasting her money on counsel,

14  and described the benefits of cooperation and the stiff jail term she would face in

15  its absence.  *Id.*

16    In this case, the agents executed a search warrant at Defendant's home in

17  Tekoa, Washington, on May 20, 2005, after his indictment in the Western District

18  had been dismissed.  The agents did not inform Magistrate Judge Imbrogno that the

19  case had been dismissed when establishing probable cause.  In the course of

20  executing their warrants, the agents seized about 26 pages of written material in

21  addition to materials within the scope of the search warrant.  The disputed material

22  was correspondence between Defendant and his appointed Federal Public Defender

23  in the Western District, Tim Lohraff.  The correspondence was dated May 8, 2005,

24  and April 25, 2005.

25    The *Morrison* Court noted that "we have implicitly recognized the necessity

26  for preserving society's interest in the administration of criminal justice.  Cases

27  involving Sixth Amendment deprivations are subject to the general rule that

28  remedies should be tailored to the injury suffered from the constitutional violation

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 14

1    and should not unnecessarily infringe on competing interests."  449 U.S. at 364.

2    Therefore, "absent demonstrable prejudice, or substantial threat thereof, dismissal

3    of the indictment is plainly inappropriate, even though the violation may have been

4    deliberate."  *Id*. at 365.  The Court noted that the proper remedy for Fourth and

5    Fifth Amendment violations has not been dismissal of the indictment, but rather it

6    has been suppression of the evidence wrongly obtained.  *Id*. at 365-66.

7        Therefore, this Court must "identify and then neutralize the taint by tailoring

8    relief appropriate in the circumstances to assure the defendant the effective

9    assistance of counsel and a fair trial."  *Id*. at 365.  This action must only be taken if

10       the constitutional infringement identified has had or threatens some
         adverse effect upon the effectiveness of counsel's representation or has
11       produced some other prejudice to the defense.  Absent such impact on
         the criminal proceeding, however, there is no basis for imposing a
12       remedy in that proceeding, which can go forward with full recognition
         of the defendant's right to counsel and to a fair trial.

13   *Id*.

14       The Government submits that this violation was not intentional.  It states that

15   the warrant was document- and correspondence-intensive, for the agents were

16   looking for evidence of Defendant's relationship with S.C.  It recognizes that a

17   search must be limited in scope to the terms of the warrant, but the Government

18   states that suppression of the illegally-obtained evidence is the more appropriate

19   remedy here.  Additionally, the Government points out that suppression of *all*

20   evidence recovered by the agents is not appropriate unless there was flagrant

21   disregard for the terms of the warrant.  *United States v. Daniels*, 549 F.2d 665, 668

22   (9th Cir. 1977) (stating that "[t]he exclusionary rule does not require the

23   suppression of otherwise legal seizures merely because they were part of the same

24   search in which an illegal seizure occurred"); *United States v. Heldt*, 668 F.2d

25   1238, 1259 (D.C. Cir. 1981).   Because this correspondence was outside the scope

26   of the search warrant but not seized in flagrant disregard of the warrant, the

27   Government contends the proper remedy is suppression and the return of these

28   documents to Defendant.

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 15

Defendant asserts, however, that in this case there is demonstrable prejudice or, at the very least, a substantial threat thereof to the Defendant resulting from the Government's seizure of this privileged material. The Court cannot discern from the parties' submissions what prejudice would result from the illegally-seized documents. Thus, the Court orders submission of the seized documents to the Court for *in camera* review so that it may determine the appropriate remedy. In the alternative, the parties are encouraged to work toward a mutually agreeable solution if possible.

## III.    Defendant's Motion to Suppress Statements

Defendant asks the Court to suppress Defendant's statements and the evidence obtained as a result of Defendant's statements. The Government contends that Defendant's *Miranda* rights were not violated, and that his waiver was intelligent, knowing, and voluntary. Initially, the Court must determine whether Defendant was timely informed of his *Miranda* rights. If Defendant's *Miranda* rights were timely, the Court must then consider whether Defendant waived those rights in a knowing, voluntary, and intelligent manner.

### A.    Custody under *Miranda*

"In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that because of the inherently coercive nature of custodial interrogation, a person must be advised on his rights prior to questioning." *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001). Not all questioning by law enforcement officers triggers the warning requirement, however. For *Miranda* purposes, the key inquiry is whether the defendant is in custody. *Id*. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. There are many scenarios in which a person may be detained by law enforcement officers and may not be free to go, but is not in "custody" for *Miranda* purposes. *Butler*, 249 F.3d at 1098.

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 16

One such situation is during brief detentions at border crossings. *Id.* "Stops and routine questioning are the norm at the border in the primary inspection areas." *Id.* (quoting *United States v. Leasure*, 122 F.3d 837, 840 (9th Cir. 1997)). When determining whether a border interrogation was a "custodial interrogation" in *Miranda* terms, district courts are "to look to the objective circumstances of the interrogation, not to the subjective view harbored by either the suspect or the interrogating officers to determine whether the defendant is in custody." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

> Although the existence or non-existence of probable cause might be one factor to consider in determining someone's custodial status in the twilight zone between detention and custody, what ultimately matters to the determination of whether *Miranda* is triggered is *custody*, which is determined not by the existence of probable cause, but by looking to the objective circumstances of the interrogation. Those circumstances include the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt.

*Butler*, 249 F.3d at 1099 (internal citations and quotation omitted) (emphasis in original).

Accordingly, the Court must perform an objective analysis of the events leading up to when Defendant was informed of his *Miranda* rights to determine whether a reasonable person would have thought he was in custody. *Id.* The "reasonable person" test presupposes the person being detained is innocent. *United States v. Bravo*, 295 F.3d 1002, 1009 (9th Cir. 2002) (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). Hence, "whether an individual is in custody depends upon the objective circumstances of the situation, or whether a reasonable innocent person in such circumstances would conclude that *after brief questioning he or she would not be free to leave*." *Id.* (emphasis in original) (internal quotation and citations omitted).

The Ninth Circuit has repeatedly held that "special rules apply at the border" when determining whether a person who is detained is "in custody" for *Miranda* purposes. *Butler*, 249 F.3d at 1098; *see also, e.g.*, *Bravo*, 295 F.3d at 1006; *United*

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 17

1  *States v. Manasen*, 909 F.2d 1357, 1358 (9th Cir. 1990).  Certainly, "careful

2  review of transit through our international borders is essential to national security,

3  health, and public welfare."  *Bravo*, 295 F.3d at 1006 (internal quotation and

4  citation omitted).  Accordingly, Customs and Border Patrol, when conducting

5  border searches and inspections, deserves and receives great deference from courts

6  reviewing whether and when temporary detention at the border metamorphoses

7  into custody.

8      Many Ninth Circuit cases considering the question of custody at

9  international borders arise from situations in which the defendant is detained

10  during a search of his or her vehicle for contraband.  *E.g.*, *id*. at 1004-05; *Butler*,

11  249 F.3d at 1096-97; *Leasure*, 122 F.3d at 838-39.  This case presents a different

12  scenario; one in which the defendant is detained at the border for questioning

13  alone.  A somewhat analogous situation is a border stop resulting in an arrest for an

14  immigration offense.  There are several unpublished decisions from the Ninth

15  Circuit involving immigrants who are discovered to be illegally entering or

16  attempting to enter the country and who challenge the admissibility of their

17  answers to questions during the inspection on *Miranda* grounds.  *E.g.*, *United*

18  *States v. Saavedra-Martinez*, 120 Fed. Appx. 706 (9th Cir. 2005); *United States v.*

19  *Perez-Cabrera*, 161 F.3d 15 (9th Cir. 1998).  However, these cases are

20  distinguishable from the case at hand because questions of citizenship and the

21  legality of one's actual entry into the country are fundamental to the inspection

22  process.

23      The Government asserts that *United States v. Manasen*, 909 F.2d 1357 (9th

24  Cir. 1990), is more on-point.  In *Manasen*, the district court denied the defendant's

25  motion to suppress, finding the defendant was not entitled to *Miranda* warnings

26  before giving information to customs officials in a routine, non-custodial

27  inspection at the border.  *Id*. at 1359.  *Manasen* involved a defendant who was

28  traveling from Singapore to Vancouver, B.C., and intending to travel by bus from

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 18

there to Seattle.  Canadian officials discovered he was a fugitive with an

outstanding California warrant for his arrest.  *Id*. at 1357.  Canadian officials

informed U.S. Customs officials that the defendant was traveling by bus to Seattle,

and they gave the officials his physical description and information that he may be

using a certain alias to cross the border.  *Id*. at 1357-58.  When the defendant

arrived at the Blaine Port of Entry, he completed a customs declaration form and

used the suspected alias, providing a California driver's license for identification.

Once the inspection was complete, another customs agent approached the

defendant, told him of the outstanding warrant, and arrested him.  *Id*. at 1358.

The *Manasen* defendant argued that because the agents "had probable cause

to arrest him on an outstanding warrant and knew their questions were reasonably

likely to elicit an incriminating response, *Miranda* warnings were required prior to

his border inspection."  *Id*.  The Ninth Circuit disagreed, explaining that

> [c]ustoms officials are bound to examine every person entering the
> United States.  There was no reason to interrupt the routine questioning
> of [the defendant].  In fact, to hold otherwise would be to impair the
> effectiveness of United States Customs.  National self-protection
> reasonably requires one entering the country to identify himself as
> entitled to come in and his belongings as effects which may be lawfully
> brought in.

*Id*. at 1358-59 (internal citations and quotation omitted).  The court further stated

that "*Miranda* warnings were not required because probable cause to arrest [the

defendant] for a charge unrelated to his customs inspection did not transform the

routine procedure into custodial interrogation."  *Id*. at 1359.

The Government encourages the Court to find that U.S. officials were not

required to give *Miranda* warnings until they had probable cause to arrest

Defendant.  The Court believes U.S. officials had probable cause to arrest

Defendant before his return to the United States based on Defendant's confessions

to Canadian officials and the March 30, 2005, investigation.  Here, the probable

cause that existed to arrest Defendant was not related to the purposes of the

inspection, just as in *Manasen*.  In the Court's view, the Government's position

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 19

would require U.S. officials immediately to *Mirandize* Defendant upon his return. As the above discussion explains, however, the existence of probable cause is not determinative, but is a factor to consider when determining a person's custodial status. *Butler*, 249 F.3d at 1099.

The CBPOs both reported that Defendant was nervous, shaky, and even distraught, indicating that he likely felt some pressure and apprehension during his inspection. Defendant asked the officers near the beginning of his inspection whether he was under arrest, and they informed him that he was not. "[A]n officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest." *Bravo*, 295 F.3d at 1011. Nevertheless, even though Defendant may have actually felt that he was in trouble and exhibited his apprehension, the inspectors could legitimately ask routine questions without converting the circumstances into custodial interrogation.

In these circumstances, the Court does not find particularly useful the concept of custody. At the border, one is in custody and not permitted to leave the border in either direction until permission is granted by the border officials. More useful to the Court is the concept of the nature of the questions asked and whether they are legitimately related to the border entry, or in other words, whether the inspection was "routine." Questioning at the border about a prior criminal offense in the United States, for instance a bank robbery, would be unrelated to the border function. Such questions may make the questioning custodial even though the only distinguishing factor of the two interrogations is the subject matter of the questions.

The heart of the issue in this case is whether the questions asked during Defendant's inspection deviated from the "routine" in such a way as to make it custodial interrogation. Put another way, the question is "when—not whether, but when—the criminal investigation is far enough advanced that the privilege [to receive *Miranda* warnings] offers some protection." *United States v. Gupta*, 183

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 20

F.3d 615, 618 (7th Cir. 1999). The Court could find no Ninth Circuit cases that describe exactly what questions may be asked during a "routine" border inspection and when an inspection actually becomes custodial for *Miranda* purposes. The Circuit's five-factor test in *Butler* is helpful, but it is not on all fours with the circumstances presented in this case. 249 F.3d at 1099 (listing five factors that may indicate a routine border stop has become custodial: (1) the language used by the officers; (2) the physical characteristics of the place where the questioning occurs; (3) the degree of pressure applied to detain the individual; (4) the duration of the detention; and (5) the extent to which the person is confronted with evidence of his own guilt).

Other circuits have provided helpful authority regarding the kinds of questions asked in a "routine" inspection at the border. In *Gupta*, Judge Easterbrook explained that

> [a] person seeking entry into the United States does *not* have a right to remain silent; the immigrant must honestly describe his identity, nationality, business, and claim of entitlement to enter, and must do this without the aid of counsel. The United States is entitled to condition entry on willingness to provide essential information. No information, no entry.

183 F.3d at 617 (emphasis in original). Examining a fixed checkpoint stop of a person seeking entry in a vehicle, the Tenth Circuit states that

> border patrol agents may question individuals in the absence of individualized suspicion about their citizenship and immigration status and request documentation. Agents may briefly question individuals concerning such things as vehicle ownership, cargo, destination, and travel plans, as long as such questions are reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband. . . . Additionally, if an agent observes suspicious circumstances during initial questioning, he may briefly question the motorist concerning those suspicions and ask the motorist to explain.

*United States v. Massie*, 65 F.3d 843, 847-48 (10th Cir. 1995) (internal citations and quotations omitted).

Likewise, the Sixth Circuit has held that a defendant "must do more than simply show that the questioning has somehow deviated from the questioning of

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 21

the average Customs interrogee. . . .  Here . . . there is no indication that defendant was asked anything other than routine questions.  The questions being asked of defendant . . . were directed toward learning and confirming his identity and citizenship."  *United States v. Ozuna*, 170 F.3d 654, 658-59 (6th Cir. 1999) (internal citations omitted).  The Eleventh Circuit has recognized that "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest."  *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).  In a document available on its website, U.S. Customs and Border Patrol advises U.S. citizens traveling internationally that upon their return they "may be asked questions on the nature of [their] citizenship, [their] trip, and about anything [they] are bringing back to the United States that [they] did not have with [them] when [they] left."  U.S. Customs & Border Protection, *Know Before You Go*, at 3, *at* http://www.customs.ustreas.gov/linkhandler/cgov/toolbox/publications/travel/kno wbeforeyougo.ctt/knowbeforeyougo.pdf ("*Know Before You Go*").

Upon initial review of the facts and progression of Defendant's inspection and eventual arrest, the Court suspected his inspection may have been custodial. The CBPOs and Agent Darrah knew that Defendant had not been permitted entry into Canada and why.  The only part of Canada Defendant visited was the Port of Entry.  His entire visit was spent under interrogation by Canadian officials.  It would have been impossible for Defendant to pick up any contraband or other items to declare upon his return to the United States.  Therefore, the inspection to re-enter the United States may have been a mere formality.

After careful deliberation, however, the Court finds that Defendant's initial inspection was routine, and that the CBPOs were not required to inform him of his *Miranda* rights before questioning him.  Defendant was detained for nearly 45 minutes awaiting his inspection with the CBPOs, but this is not an inordinate

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 22

1  amount of time, especially given the fact that he had been turned back by the

2  Canadian authorities.  *See Ozuna*, 170 F.3d at 658 (stating that "[b]revity is not,

3  however, a precondition to the lawfulness of questioning at a border").

4  Defendant's initial interview took place in an open, public place, where inspections

5  normally are conducted in the Blaine Port of Entry.

6      Additionally, the nature of the officers' questions were "routine."  They

7  reviewed Defendant's customs declaration and proceeded to ask Defendant why he

8  traveled to Canada, his mode of transportation, and what he thought of Canada's

9  denial of entry and its reasons.  While the Defendants return was probably an

10  unusual event in the day of a border inspector, it would, nonetheless, appear

11  routine and appropriate to inquire about Defendant's explanation of the events and

12  reasons for the Canadian refusal to admit into Canada.  The fact that CBPOs Botten

13  and Bikker knew from the Canadian perspective the reason Defendant was refused

14  entry to Canada does not, in the Court's view, prohibit them from asking questions

15  about the same subject of Defendant in the course of their duties.  The receipt of

16  such information from the Canadian authorities does not transform these questions

17  into "custodial interrogation," particularly considering the Court's inquiry must be

18  objective.  There was nothing coercive about this line of questioning.  Here the

19  questions relate to the border function.  Where the inquiry by the Court of custody

20  is to be objective, the nature of the questions posed did not turn Defendant's

21  inspection into a custodial interrogation.

22      The Court finds that Defendant was not in custody while the CBPOs were

23  conducting his initial inspection upon re-entry.  The totality of the circumstances,

24  from the point of view of a reasonable *innocent* person, require the finding that

25  Defendant was not in custody during his initial inspection.  The fact that Defendant

26  made incriminating statements during this initial inspection does not alter the fact

27  that the CBPOs had no duty to *Mirandize* him.

28      Routine border inspections require the courts to create a legal fiction that

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 23

they are non-custodial for *Miranda* purposes, for those seeking entry into the United States are not free to leave prior to establishing their eligibility to enter the country.  This was a routine border inspection, even though the officers had probable cause to detain and interrogate Defendant and were planning on doing so once the routine inspection was complete.   The existence of probable cause to arrest does not mean that a person seeking entry cannot be processed or asked questions concerning entry.  The Court holds that CBPOs do not have to *Mirandize* suspects re-entering the United States before conducting a routine border inspection.  To do so would go against established precedent and be counter to U.S. Customs and Border Patrol's mission to "steadfastly enforce the laws of the United States while fostering our Nation's economic security through lawful international trade and travel." *Know Before You Go*, at 3.

**B.    Waiver**

The Court's inquiry does not end here, however.  After his inspection with the CBPOs, Defendant went to a detention cell with Agents Darrah and Poore.  After approximately 20 minutes of questioning, when Defendant again told the agents that he traveled to Canada to meet with a 15-year-old girl, Agent Darrah read Defendant his *Miranda* rights.  The Government argues that at this time Defendant waived his rights in a knowing, voluntary, and intelligent manner, and thus his later statements should also be admissible.

The Government bears the burden of proving by a preponderance of the evidence that a waiver of *Miranda* rights, including the right to remain silent, was both intelligent and voluntary. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (intelligent and voluntary standard); *Colorado v. Connelley*, 479 U.S. 157, 168 (1986) (articulating preponderance of the evidence standard).  To be intelligent and voluntary, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 24

1      The waiver, however, need not be explicit. *Butler*, 441 U.S. at 373. "[I]n at

2  least some cases waiver can be clearly inferred from the actions and words of the

3  person interrogated." *Id.*; *see Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir.

4  2004) (finding a valid implicit waiver where the defendant stated he understood his

5  rights and stated "I want to talk to you"). In *Terrovona v. Kincheloe*, the Ninth

6  Circuit held that a handcuffed defendant implicitly waived his *Miranda* rights after

7  he was read a waiver form and stated that he understood his rights (but did not sign

8  a form due to his handcuffs), and was not asked to waive his rights. 912 F.2d

9  1176, 1180 (9th Cir. 1990). The court found implicit waiver by the defendant in

10 *Terrovona* based on his exculpatory statements in response to officer questions and

11 his above-average intelligence. *Id.*

12      A court must look to the "totality of the circumstances," including the

13 background, experience, and conduct of defendant in determining whether a waiver

14 is valid. *United States v. Vallejo*, 237 F.3d 1008, 1014 (9th Cir. 2001). A waiver

15 is voluntary if, under the totality of the circumstances, the confession was the

16 product of a free and deliberate choice, rather than coercion or improper

17 inducement. *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir.1986).

18      Mr. Simonson has his bachelor's degree and appears to be of above-average

19 intelligence. The Court's observations of Defendant during the hearing and Agent

20 Darrah's testimony regarding their interview indicate Defendant understood his

21 *Miranda* rights. The agents interviewing Defendant stated he was forthcoming

22 with his story and willing to speak freely. They report talking to him about his

23 *Miranda* rights at least twice during their interrogation. It troubles the Court that

24 Agent Darrah did not obtain a written waiver or even ask Defendant, as the

25 *Miranda* card prompts, "Having these rights in mind, do you wish to talk to us

26 now?" However, a preponderance of the evidence supports a finding that

27 Defendant knew at the time that he was in custody and he was being interrogated,

28 and that he understood his rights when they were explained to him. An explicit

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 25

1    waiver certainly did not occur here, but an implicit waiver did.

2        **C.    Voluntariness**

3        Defendant submits that, even if he waived his *Miranda* rights implicitly, his

4    statements were not made voluntarily. The Constitution demands that confessions

5    be made voluntarily. *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972).  "A

6    waiver is voluntary if, under the totality of the circumstances, the confession was

7    the product of a free and deliberate choice rather than coercion or improper

8    inducement."  *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (*en banc*).

9    A confession is involuntary if coerced either by physical intimidation or

10   psychological pressure.  *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.

11   1981).  The test for voluntariness is whether officers overbore the defendant's will

12   when he confessed.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973);

13   *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003).[4]  The Government bears the

14   burden of proving that the defendant's statements were voluntary and must do so

15   by a preponderance of the evidence.  *See Lego*, 404 U.S. at 489.

16       A confession accompanied by physical violence is *per se* involuntary, while

17   one accompanied by psychological coercion is not.  *United States v. Miller*, 984

18   F.2d 1028, 1030 (9th Cir. 1993).  In the case at hand, no evidence exists that an

19   officer used physical violence or threats against Defendant.  Thus, the Court must

20   look to the totality of the circumstances surrounding Defendant's confession.  *Id.* at

21
_____

22       [4] Under 18 U.S.C. § 3501(b), when determining whether a confession is

23   voluntary, the Court must also consider: (1) the elapsed time between arrest and

24   arraignment; (2) whether the defendant knew the nature of the charged offense at

25   the time of the confession; (3) whether the defendant had been advised or knew he

26   was not required to make any statement, and that such statement could be used

27   against him; (4) whether defendant had been advised prior to questioning of his

28   right to counsel; (5) whether defendant was without assistance of counsel when

     questioned and when giving such confession.  18 U.S.C. § 3501(b).

     ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 26

1031.  When performing a totality of the circumstances analysis courts often

consider "the youth of the accused, his intelligence, the lack of any advice to the

accused of his constitutional rights, the length of detention, the repeated and

prolonged nature of the questioning, and the use of physical punishment."  *United

States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003) (citing *Schneckloth*, 412 U.S. at

226).[5]

Here, Defendant was 50 years old at the time of his arrest.  He appears to be

of above-average intelligence and well-educated.  The agents interviewing him

informed him of his rights.  However, Defendant's detention by Canadian officials

began at approximately 3:45 p.m., and he was not informed of his rights until after

6:00 p.m.  Defendant was not arrested until after 9:30 p.m.  He was asked to

recount his story by Canadian officials, by CBPOs, and then again by Agents

Darrah and Poore.  Although this questioning was not extremely repetitive, it

certainly was somewhat prolonged.  Additionally, Defendant's only method of

transportation, the Greyhound bus, was long gone by the time he was returned to

the U.S. authorities.

After being questioned by Canadian officials, Defendant may have felt the

cat was out of the bag and there was no point in not answering questions put to

him.  Additionally, Defendant had no experience with the criminal justice system,

so he was not necessarily very familiar with the laws and rights associated with it.

However, the cat-out-of-the-bag theory is no excuse when the earlier confessions

or admissions are voluntarily given.  *See Oregon v. Elstad*, 470 U.S. 298, 318

(1985) (stating that "there is no warrant for presuming coercive effect where the

---

[5] A defendant's subjective characteristics are relevant to the voluntariness

inquiry when there is evidence of psychological coercion, because such personal

sensitivities may "render[ ] him more susceptible to subtle forms of coercion."

*Commonwealth of Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 485 (9th

Cir. 1992).

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 27

suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary.  The relevant inquiry is whether, in fact, the second statement was also voluntarily made. . . .  The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. . . .  We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.").  Defendant's case is even further from improper governmental conduct because the prior recitations of his story were to Canadian authorities and border officers conducting a legal routine border inspection where *Miranda* was not implicated.

Defendant urges the Court to consider the Supreme Court's plurality opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004).  The *Seibert* plurality considered the practice of "question first and warn later" and identified as the threshold issue whether "it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."  *Id*. at 611-12.  "The Ninth Circuit has not taken pluralities as being controlling."  *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 655 (9th Cir. 1992).  The circuit has not yet made clear whether it intends to adopt the reasoning set forth by the plurality in *Seibert*.  *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129-30 (9th Cir. 2005) (finding the *Seibert* plurality opinion "inapposite" because it "did not address the issue raised in this case"); *but see id.* at 1133, Berzon, J., dissenting in part ("I would follow the reasoning of the *Seibert* plurality").

The *Seibert* plurality found that the question-first-warn-later tactic, also known as a "midstream" *Miranda* warning, is not always effective enough to accomplish its object.  *Seibert*, 542 U.S. at 615.  The plurality held that midstream warnings are effective when "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and] the *Miranda* warnings could have made sense as presenting a genuine choice whether

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 28

to follow up on the earlier admission." *Id*. at 615-16.  Factors relevant to this inquiry include "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*. at 615.  The Court finds the *Seibert* plurality's reasoning persuasive and agrees that it should inquire into whether midstream *Miranda* warnings are effective, and subsequent statements voluntary, on a case-by-case basis.  However, as pointed out earlier, the evil addressed by late *Miranda* warnings assumes that warnings were required earlier and were not given.  Such is not the case in this instance as the prior questioning by Canadian and border authorities did not require warnings.

Here, Defendant was questioned and confessed to his intentions in varying amounts of detail three times, twice before hearing his *Miranda* warnings.  Although Defendant was asked the same questions during each round of interrogation, the setting of each round was different, the personnel questioning him varied, and each round of questions started anew.  However, Defendant was asked to repeat the same content during each interview and the interviews immediately succeeded each other.  Defendant was almost continuously questioned for over three hours, and he went over the details of his travels fairly completely with each set of law enforcement officers.

By the time Defendant was informed of his *Miranda* rights, he had told his story two times, once to Canadian officials and once to American officials.  He had also admitted the intent behind his travel plans to Canada a third time.  However, Agents Darrah and Poore took a break in questioning immediately after Defendant incriminated himself to them, after which they informed him of his *Miranda* rights.  There was no obligation to tell the Defendant that his first statements could not be used against him, and those first statements did not violate the principles

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 29

articulated in *Miranda*.  The *Miranda* warnings are clear, and the break in the proceedings, although short in duration, took place immediately after Defendant made an incriminating statement.  The Government has met its burden of proving by a preponderance of the evidence that Defendant's confessions to Agents Darrah and Poore were voluntary.

Accordingly, **IT IS HEREBY ORDERED**:

1.  Defendant's Motion to Dismiss Count One of the Indictment (Ct. Rec. 33) is **DENIED**.

2.  Defendant's Motion to Dismiss Indictment (Ct. Rec. 38) is **GRANTED in part, DENIED, in part**.  The parties shall submit the wrongfully-seized documents to the Court for an *in camera* review to determine the appropriate relief.

3.  Defendant's Motion to Suppress Statements and Evidence Obtained as a Result of Statements (Ct. Rec. 36) is **DENIED**.

4.  Defendant's Motion to Suppress Evidence Obtained from Warrants (Ct. Rec. 40) is **DENIED**.

5.  Defendant's Motion for Extension of Time to File (Ct. Rec. 31) is **DENIED as moot**.

6.  Government's Motion for Discovery (Ct. Rec. 24) is **GRANTED**.

7.  Pursuant to 18 U.S.C. § 3161(h)(1)(F), the time between December 5, 2005, the date Defendant filed his motion to dismiss Count 1, until January 17, 2006, the date the Court ruled on these motions, is **declared excludable** for purposes of the Speedy Trial Act.

8.  A pretrial conference is **set** for **January 27, 2006, at 9:00 a.m.**, in Spokane, Washington.  The trial date shall be set after conferring with the parties at the pretrial conference.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and forward copies to counsel.

**DATED** this 17th day of January, 2006.


                        s/ Robert H. Whaley
                      ROBERT H. WHALEY
                 Chief United States District Judge



Q:\CRIMINAL\2005\Simonson\deny.suppress.ord.wpd

ORDER DENYING MOTION TO SUPPRESS, *INTER ALIA* * 31